## PARKS v. PARKS.
### No. 8941.

Court of Civil Appeals of Texas. San
Antonio.

Dec. 7, 1932.

Sidney P. Chandler and J. Marvin Erickson, both of Corpus Christi, for appellant.

B. S. Odem and H. G. Hart, both of Corpus Christi, for appellee.

FLY, C. J.

This is a suit for divorce instituted by appellee and for a partition of property alleged to belong to the community. The divorce was granted, and the real estate was set aside for the use and benefit of appellee until the youngest child, nine years of age, should reach majority. The trial judge took the cause "under advisement" on January 4, 1932, then on February 13 he gave the divorce and gave the custody of the children to appellee, declared the property to be community, but denied a homestead interest in it to appellee, and decreed her $30 a month for the children. Then on February 26 the judgment was rendered that instead of $30 a month the homestead was given to appellee until the nine year old child became twenty-one. The last named is the judgment, from which the appeal was perfected.

It was alleged that the couple had been separated for ten years, although during that time they had occupied the same house, had eaten and, at times, had fought connubial battles at the same table. The marriage had continued for twenty-five years, the husband being twenty-five years old at the time of marriage, and the wife sixteen or seventeen years of age. There were five children, ranging in age from twenty-one down to nine, three girls and two boys.

The bulk of the testimony upon which the divorce was granted not only from the bonds of matrimony, but as to appellant a divorce from the only home he had the right to enter, was that of appellee, the children of the marriage, and relatives of the wife. Some of them evinced strong animosity to appellant. Most of the incidents upon which the right to a divorce was claimed arose long before the suit was filed. The row precipitated by the husband and father slapping his daughter, who had been impertinent; and this had occurred nearly two years before the suit was filed. They lived in the same house, ate at the same table even after the suit was instituted. The suit was filed in 1930, and for nine months afterwards the couple lived under the same roof. The facts indicate that the wife had outstripped the husband in education and in modern ideas concerning marital relations, and, if she ever heard of the husband being the head of the household, she had repudiated it with vigor and Spartan determination. She attended business schools without consulting him, and without his knowledge or consent traveled to Wichita Falls, probably four hundred miles away, in North Texas, and had her tonsils removed. There was, under the benign influence of a Texas statute which destroyed a rule of evidence sanctified by centuries of experience, a full exposure, by the parties to the marital contract, of matters in times past deemed too sacred for the ears of a court and a thrill hunting public, and this exposure was made by the husband and wife in their criminations and recriminations. One affirmed, the other denied, as might be expected in such a school for false swearing. The statute granting the right of the testifying against each other has practically destroyed the sanctity of the marriage relation, which had been fostered through a hundred generations of our ancestors. Divorce has become so easy that the marriage relation is entered into lightly because of its evanescent character. We hear it flippantly said by those who have the power of annulling marriage that, when the parties become uncongenial to each other, a divorce should be granted. If no one was affected but the parties themselves, that policy would have more force, but it shakes the very foundation of government in the destruction of the home and the lives of growing children. In the earliest judicial history of Texas as a state, Chief Justice Hemphill, in Sheffield, v. Sheffield, 3 Tex. 79, had prophetic vision as he predicted the terrible results from a loose administration of the marriage and divorce laws. That great jurist said:

"The nature, object, and important purposes of the contract, should have their just influence upon the mind. The parties have pledged themselves, not only for their own happiness, but for purposes important to society, to live together during the term of their natural lives. This engagement is the most solemn and important of human transactions. It is regarded by all Christian nations as the basis of civilized society, of sound morals, and of the domestic affections; and the relations, duties, obligations and consequences flowing from the contract, are so important to the peace and welfare of society, as to have placed it under the control of special municipal regulations, independent of the will of the parties. The mutual comfort and happiness of the parties are the principal, but not the only, objects of the engagement. It is intended, also, for the benefit of their common offspring, and is an important element in the moral order, security and tranquillity of civilized society. The parties cannot dissolve the contract, as they can others, by mutual consent, and no light or trivial causes should be suffered to effect its rescission. While full effect is to be given to the statute, it should be remembered that, according to the experience of the most enlightened nations, the happiness of married life greatly depends on its indissolubility, and that the prospect of easy separations foments the most frivolous quarrels and disgusts into deadly animosities. Parties may not be able to live together very harmoniously, but they cannot be separated, except for reasons approved of by the law. And when they know they must live together, except for causes prescribed by the law, they learn, in the language of Lord Stowell, 'to soften, by mutual accommodation, the yoke which they know they cannot shake off; they become good husbands and wives from the necessity of remaining husbands and wives; for necessity is a powerful master in teaching the duties it imposes.' Such construction ought to be given the statute, and such weight allowed the acts of the parties, as would effect the legislative intention; but there should not be such looseness of exposition as would defeat the beneficial objects of the marriage institution, and sunder its bonds with almost as much facility as if it were a state of concubinage, dependent alone on the will of the parties."

■■ It is true that the testimony was heard and weighed by the district judge, and in other cases than those of divorce where the testimony is conflicting the judgment of the trial judge on the facts will not be interfered with by an appellate court, but in divorce cases no such rule prevails. The statute, article 4632, requires in divorce suits that divorces be rendered only when full and satisfactory evidence is adduced, and it must not only be sufficient for the trial judge, but must be found "full and satisfactory" by the appellate court. As said by this court in Lohmuller v. Lohmuller, 135 S. W. 751, 754: "In suits for divorce the same respect is not required for the verdict of a jury as in other cases, and the trial judge in decreeing a divorce does not proceed upon the verdict, but upon his own judgment, and, when the cause reaches this court, it too must be convinced that the evidence is 'full and satisfactory,' before it will affirm a judgment. Moore v. Moore, 22 Tex. 237. And, when a judgment for divorce depends largely, if not altogether, upon the testimony of the spouse seeking the divorce, a decree dissolving the bonds of matrimony will not be granted unless the other facts and circumstances tend to corroborate his or her testimony. Seago v. Seago [Tex. Civ. App.] 64 S. W. 941."

■ We conclude that the evidence is not "full and satisfactory," and fails to sustain the divorce. The acts of any importance were condoned by the wife by remaining under the same roof with her husband many months, and in most instances many years.

The judgment is reversed, and judgment here rendered that a divorce be denied.